IN THE UNITED STATES BANKRUPTCY COURT FOR THE
WESTERN DISTRICT OF PENNSYLVANIA

IN RE:

| | | |
|---|---|---|
| ELIZABETH R. BEHANNA | : | Case No. 04-36839 TPA |
| dba Bubby's Star Lanes, | : | |
| Debtor | : | Chapter 13 |
| | | |
| JOSEPH J. STRANKO AND NELLIE | : | |
| DARLENE STRANKO, | : | |
| Movants | : | |
| | : | Related to Document No. 51 |
| vs. | : | |
| | : | |
| ELIZABETH R. BEHANNA, T.H.E. | : | |
| INSURANCE COMPANY and | : | |
| RONDA J. WINNECOUR, ESQUIRE, | : | |
| Chapter 13 Trustee, | : | |
| Respondents | : | |

*Appearances:* Mary Bower Sheats, for Movants
Gary Davis, for Movants
Gary Bax, for T.H.E. Insurance Company
Donald G. Lucidi, for T.H.E. Insurance Company
Lisa Swanson for Ch. 13 Trustee

## *MEMORANDUM OPINION*

Currently before the Court is the ***Motion to Abandon Property and for Relief from the Automatic Stay Nunc Pro Tunc*** ("Motion") filed by Joseph S. Stranko and Nelly Darlene Stranko ("Strankos"). The *Motion* seeks annulment of the automatic stay to the extent such relief is even required. Of the named respondents, only T.H.E Insurance Company ("T.H.E. Insurance") filed a response opposing the relief requested in the *Motion*. The Court conducted evidentiary hearings on November 15, 2007 and December 19, 2007, at which time the Parties were given a full

opportunity to present their cases.  On January 28, 2008, the Parties presented final arguments in

support of their respective positions.  For the reasons that follow, the Court will grant the *Motion*

and provide the requested relief.[1]

## *FACTS*

This case concerns a bowling alley business named "Bubby's Star Lanes" formerly

located at 134 Donner Avenue, Monessen, Pennsylvania ("Star Lanes").  For many years Star Lanes

was owned and operated by the Strankos, who also owned and operated another bowling alley

business known as "Tan-O-Bell Lanes"in Monongahela, Pennsylvania.  In 2001 while winding

down in preparation toward retirement, the Strankos decided to sell Star Lanes to the Debtor,

Elizabeth Behanna ("Debtor") and her 23 year old son George Behanna.  From the Behanna's

perspective, the plan was for George to actually operate the business since the Debtor already

enjoyed full-time employment as a nurse.  Tragically however, George died shortly after the

purchase of Star Lanes which appears to have ultimately led to the instant bankruptcy filing several

years later when it became apparent that the Debtor could not succeed at the business under

circumstances in which she found herself.

Although there were some minor discrepancies in the testimony of various witnesses,

it is clear that the total purchase price for the Star Lanes business (including the real estate,

personalty and goodwill) was $300,000.  Originally the Behannas intended to obtain all necessary

---

[1]     The Court's jurisdiction under *28 U.S.C. §§157* and *1334* was not at issue.  This is a core proceeding pursuant to *28 U.S.C. §§157(b)(2)(B), (F), (K) and (O).*

financing from a commercial lender.  However, that lender, Equity One, was ultimately only willing

to lend the Debtor $117,000 leaving a gap in the financing.  As a result, the Strankos agreed to

finance a portion of the purchase price.  Both the Strankos and the Debtor testified at the evidentiary

hearing regarding the circumstances surrounding the Stranko-Behanna closing.  Although both were

somewhat unclear about the specific details of what happened, between that testimony and the

documentary evidence which was supplied, the substance of the overall transaction became clear.

The HUD–1 Settlement Statement (HUD-1) from the closing (Ex. 4(a)) set forth a

purchase price of $180,000, which represented only the real estate portion of the transaction.  The

HUD-1 revealed that $117,000 of the purchase price was financed by Equity One which took a first

mortgage lien on the Star Lanes property to secure its loan.  The HUD-1 further demonstrated an

additional loan in the amount of $36,000 from financing ostensibly provided by the Strankos which

was secured by a second mortgage on the Star Lanes real estate.  Also shown on the HUD-1 was a

$9,000 sellers "closing credit" and receipt by the Strankos of $27,817.73 in cash from the Debtor

and her son.  For reasons which remain unclear, the $36,000 mortgage listed only Joseph Stranko

as "lender" and only Elizabeth Behanna as "borrower" (Ex. 4), although an accompanying note

listed both Strankos as "lenders" and only Elizabeth as "borrower."  Nevertheless, at the evidentiary

hearing, T.H.E. Insurance stipulated that a second mortgage in favor of the Strankos was placed

against the Star Lanes property in the amount of $36,000.

Two other notes were signed as part of the closing.  There was a $110,354.27 note

from both Behannas as "borrowers" to the Strankos as "lenders" and a similar note in the amount

of $5,400.  (See Ex. 4(b) and 4(c)).  Neither of these notes was accompanied by a mortgage and they

3

therefore represent unsecured debt .[2]

Based on the testimony and exhibits, it remains uncertain as to the exact date of the Stranko-Behanna closing.  The HUD–1 is dated February 23, 2001 as is the deed (which, incidentally, misidentifies Elizabeth and George Behanna as "wife and husband" rather than "mother and son").  However, the deed was not recorded until April 9, 2001.  Additionally, although the $36,000 mortgage document states it was given on February 23, 2001, the notarial seal on the document shows a signature date of March 15, 2001.  This mortgage was not recorded until September 14, 2001.  For some inexplicable reason the three notes were not dated.  However, the testimony at the evidentiary hearing was uncontradicted in that all of the pertinent documents were signed at the same time and as part of the same transaction.  In the end that is more significant than the specific date.[3]

---

[2] At the evidentiary hearing Counsel for the Strankos argued that these two notes were secured pursuant to the $36,000 mortgage document because they represented "advances" also intended to be covered by the mortgage.  The Court has reviewed the mortgage document and it does not find that argument persuasive.  The clear terms of the mortgage state that it is intended to be a security interest with respect to the $36,000 note, and it secures to the Strankos "(a) the repayment of debt evidenced by the Note; (b) the payment of all other sums, with interest, advanced under Paragraph 7 to protect the security of this Security Instrument; and (c) the performance of Borrowers covenants and agreements under this Security Instrument and the Note."  (Ex.4, introductory paragraph) The Strankos argument seems to be pointed toward item (b) as the source for treating the $116,000 sum represented by the other two notes as advancements secured by the mortgage.  However, the sums to be potentially advanced under Paragraph 7 of the mortgage are only those to provide protection of the Strankos' rights in the property, for example payment of a prior lienholder or making repairs to the property.  Clearly, the sums represented by the other two notes do not fall into this category.  Furthermore, the Court finds it inherently non-credible that if the Parties truly intended these other two notes to be secured under the $36,000 mortgage that they would have done so by a risky circuitous treatment of them as "advancements" when it would have been a simple matter to explicitly state that the mortgage covered $152,000 in debt comprising all three notes which were executed on the same day at the time of closing.  The Court must conclude that the language of the documents demonstrates that only the $36,000 note was secured by the mortgage.  As will be seen, however, this conclusion does not change the Court's decision on the ultimate issue.

[3] The Parties to this transaction were not well served by their legal representatives and the sloppiness with which this transaction was completed has contributed to the factual uncertainties which drove this case to the point where an evidentiary hearing was required.

4

As indicated above, shortly after the Behannas purchased Star Lanes, George Behanna died unexpectedly at an early age. Thereafter, the Debtor attempted to operate the business through use of hired managers. That worked for a while, but ultimately on December 27, 2004 she filed for Chapter 13 bankruptcy protection. In Schedule A accompanying the bankruptcy petition, she listed Star Lanes with a then-current market value of $250,000 subject to secured claims of $263,584.33. In Schedule D she identified the Equity One claim as fully secured in the amount of $114,092. The Stranko claim was listed at $144,000 also as fully secured. The Debtor testified that she based the valuation figure for Star Lanes on what she was told by the people who were managing the business at the time and that she believed the entire debt she owed to the Strankos was covered by the second mortgage.

When the Debtor first entered bankruptcy her proposed plan called for the continued operation of Star Lanes and the payment of sums to the Chapter 13 Trustee each month sufficient to pay both Equity One and the Strankos. Several objections to the proposed plan were filed and on March 30, 2005 the Debtor filed a first amended plan which called for the sale of Star Lanes by December 31, 2005 and payment of the sale proceeds to Equity One and the Strankos to satisfy their respective, secured claims. This amended plan showed the Equity One claim to be $148,675 and the Stranko claim to be $100,000. On May 2, 2005, Equity One filed an objection to the amended plan, contending that the actual amount of its claim would be $191,863.89 if payment were made in January 2006. A Conciliation Conference was held on May 12, 2005. On that same date a Plan Confirmation Order was issued, confirming the amended plan as modified at the Conciliation Conference. The Plan Confirmation Order included the following provision:

5

E.    Other provisions: Business will either be sold or the premises surrendered within 30 days.  Operating reports will be brought current through 5/05 by 6/15/05.  Amusement tax to be paid at sale or surrender.

(*Order of Court Confirming Plan as Modified and Setting Deadlines for Certain Actions and Notice of Other Actions and Orders,* Document No. 26).

The Debtor ceased operations at Star Lanes around June 1, 2005.  On that date the Debtor physically delivered the keys to the Star Lanes building to Joseph Stranko.  On July 8, 2005, the Debtor and Equity One submitted a *Joint Stipulation to Modify the Automatic Stay to Permit Foreclosure on Star Lanes to Proceed* (Document No. 35).  The Strankos were not parties to this Stipulation and the record does not reflect that they were served with a copy of it.  Additionally, the Debtor testified that the Strankos played no role in her decision to turn the property over to Equity One for purposes of foreclosure.  She knew that they became aware that this was to occur because on occasion she would "see and speak with them" when she bowled in her league at Tan-O-Bell Lanes operated by the Strankos.  She also acknowledged that she was personally aware that the Strankos were going to attempt to pay off the Equity One claim and "get Star Lanes back."  The Court approved the Joint Stipulation by Order signed and filed on July 14, 2005, unequivocally granting relief from stay and allowing Equity One to proceed with its foreclosure on the Star Lanes property.

At that point, the center of activities switched to outside the bankruptcy court setting for the next two years.  Joseph Stranko contacted his attorney after learning that Equity One had obtained relief from stay.  The testimony at the hearing was again somewhat unclear on the point,

6

but on the whole, sufficiently clear to conclude that in July 2005 there were some ongoing discussions involving the Strankos and/or their counsel with Equity One during which time the Strankos' intent to pay off the Equity One claim and resume operations of Star Lanes was communicated. This arrangement was obviously agreeable to Equity One since it in fact ultimately occurred.

Mr. Stranko testified that the nature of the bowling alley business made it absolutely essential for him to inform prospective leagues by August 1st that Star Lanes would reopen in time for the upcoming bowling season starting in September. Without such a commitment, leagues would look elsewhere for a place to bowl. Because league bowling represented such a large portion of income for the business, it would not have been possible to profitably operate Star Lanes for the 2005-2006 season unless that commitment could be made by August 1st. Further compounding the situation, the Star Lanes facility had fallen into a state of disrepair during the time it was owned by the Debtor and extensive repairs and rehabilitation were required to be done prior to the start of the 2005-2006 bowling season.

As a result of these circumstances and with the Debtor's permission, Mr. Stranko began working on Star Lanes sometime during July 2005. He was assisted in this effort by Edward Weightman with whom the Strankos signed an installment sales contract for Star Lanes on July 28, 2005. Under the terms of this contract, Weightman was to make a $30,000 down payment to the Strankos, followed by monthly installments of $2,845 until the full contract price of $275,000 was

7

paid. [4]  Although Star Lanes reopened for business some time in August, 2005, Weightman never made the required down payment.  Only two or three of the installment payments were ever made. The funds for those payments by Weightman were generated during the brief period of time in which Star Lanes was back in operation.  To the Court's knowledge,  Mr. Weightman has not stepped forward to assert any claim or interest in this matter.  Furthermore, based on the record before the Court it appears as if none exists.

On August 1, 2005, the Debtor executed a deed to Star Lanes in favor of the Strankos. This deed recites in part as follows:

> A foreclosure action was brought against the Grantor by Equity One, Inc. In the Court of Common Pleas of Westmoreland County, Pennsylvania, at No. 8117 of 2004.  The grantee, Joseph J. Stranko, is succeeding to its interest.
>
> The grantees held a second mortgage to the property in their own right which shall also be the subject of the foreclosure.

(Ex. 8).  Although there clearly had been discussions between the Strankos and Equity One as of the date of the deed about the Strankos paying off the Equity One claim, no written document exists supporting the express representation in the deed to the effect that Mr. Stranko had formally succeeded to Equity One's interest.

---

[4]        In addition to the testimony he provided at the evidentiary hearing, the Court also heard from Mr. Stranko by way of portions of a previous insurance examination under oath submitted as an exhibit by T.H.E. Insurance pursuant to *F.R.E. 801(d)(2)*.  In one of the submitted excerpts Mr. Stranko testified that the $2,845 per month to be paid by Weightman was to be generated by revenue from Star Lanes.  However, that would not be sufficient to make the payments on the new loan which Mr. Stranko took out using Tan-O-Bell Lanes as security (see discussion *infra* in the text).  Mr. Stranko agreed to provide an additional $1,000 per month from his own funds to pay on that loan. Ex. H p. 308, l. 14-21.

In order to secure funding to pay the Equity One debt, the Strankos made an application to borrow $175,000 from another bank [5] using Tan-O-Bell Lanes as security. On August 12, 2005, judgment was entered in the state court foreclosure action in favor of Equity One and against the Debtor in the amount $159, 924.93. On September 12, 2005, a sheriff sale of the Star Lanes property was scheduled for November 7, 2005. On or about September 14, 2005, using funds from the other bank loan which by then had been approved, the Strankos paid Equity One $162,216.66 in satisfaction of its claim, thus stopping the sheriff sale. The August 1, 2005 deed from the Debtor to the Strankos was recorded on September 20, 2005. On September 22, 2005, a mortgage satisfaction was signed by Equity One and on October 11, 2005, the judgment in the state court mortgage foreclosure action in favor of Equity One was satisfied. On November 9, 2005, a mortgage satisfaction signed by Equity One was recorded.

The first involvement of T.H.E. Insurance in this matter began on or about August 1, 2005 when the Strankos submitted a property insurance application for Star Lanes to T.H.E. Insurance eventually resulting in the issuance of a policy of insurance.[6] On November 18, 2005, after Star Lanes had been back in operation for only a few months, it was completely destroyed in a fire. A criminal investigation was commenced and an employee named Jerry Griest pleaded guilty to arson. The Strankos looked to T.H.E. Insurance for coverage of the loss but T.H.E. Insurance

---

[5]     Although there is no dispute between the Parties that the Strankos obtained third party financing on the Tan-O-Bell Lanes property, there is some confusion in the record as to the identity of the actual lender.

[6]     The insurance application submitted by the Strankos showed Star Lanes to have a value of $700,000. T.H.E. Insurance initially relied upon that figure as evidence to support its contention that there was substantial equity in the property when it was reacquired by the Strankos from Behanna, such that relief from stay was not warranted. However, both Parties now agree that the $700,000 figure is indicative of the replacement cost for rebuilding Star Lanes and not the fair market value of the facility. As a result, T.H.E. Insurance has conceded that the $700,000 figure is not probative on the valuation issue for purposes of the present *Motion* and the Court gives it no weight.

denied the claim. The Strankos then filed suit in state court and T.H.E. Insurance asserted a number of defenses in the action including a defense that the Strankos lacked an insurable interest in the Star Lanes property at the time of the fire for having failed to obtain relief from stay from the Bankruptcy Court before acquiring title to Star Lanes. The Strankos responded to that defense by filing the *Motion* currently under consideration.

## DISCUSSION

For purposes of this discussion, the Court must first examine whether the Star Lanes property was subject to the automatic stay provisions of the Bankruptcy Code under *11 U.S.C. §362(a)*[7] when the deed from the Debtor to the Strankos was given. Assuming that Star Lanes was subject to the stay, the Court must then determine whether the Strankos should be granted relief from the automatic stay on a *nunc pro tunc* basis so as to provide for retroactive validation of their acquisition of the Star Lanes property.[8]

---

[7]    Unless otherwise indicated, all statutory references in this Opinion are to the United States Bankruptcy Code, Title 11, *11 U.S.C. §101, et seq.* as it existed prior to October 17, 2005, the effective date of the *Bankruptcy Abuse Prevention and Consumer Protection Act of 2005* (BAPCPA), P.L. 109-8, §256, 119 Stat. 23, *11 U.S.C. §101 et seq.*

[8]    In some of their submissions and at final argument, the Strankos also ask the Court to rule on the issues of whether their payoff of the Equity One mortgage caused them to become the owner of that obligation and mortgage by operation of equitable subrogation, and whether, under Pennsylvania law, the Debtor could convey the entire title to the Star Lanes property to the Strankos in light of George Behanna's death as an intestate. See, e.g., Stranko's *Posttrial Memorandum of Law*, Document No. 86, at pp. 6-7. These are issues of Pennsylvania property and decedent's estate law. If these issues are relevant with respect to the "insurable interest" question or any other question in the pending state court insurance coverage litigation involving the Strankos and T.H.E. Insurance, it will be up to the state court to make the necessary determination. Those state law issues are not relevant or necessary for the Court's determination in this case. Furthermore, based on the current record, this Court's jurisdiction to make a decision on those issues is questionable since they do not represent either core proceedings or "related to" matters under *28 U.S.C. §157.* Accordingly, the Court's ruling is limited to whether the interest of the Debtor in Star Lanes, to whatever extent it existed at the time in question, was property of the estate and thus subject to the automatic stay, and if so, whether retroactive relief from the stay is appropriate. The Court notes, however, that if it is ever determined someone in addition to the Debtor may have possessed an ownership interest in Star Lanes as a result of George Behanna's death, that would not change the Court's analysis or ultimate ruling in this case.

10

*Whether Star Lanes was subject to the automatic stay at the time it was transferred
from the Debtor to the Strankos*

As noted, the initial matter for the Court to determine is whether Star Lanes was

property of the bankruptcy estate and therefore subject to the automatic stay at the time the Debtor

transferred ownership of it to the Strankos.  Obviously, if Star Lanes was not covered by the stay

at the relevant time, then  the Strankos did nothing wrong in acquiring the property and there is no

need for them to obtain relief from the stay at this time on a *nunc pro tunc* basis or previously at the

time of their re-acquisition of the property.  The Court concludes that Star Lanes was no longer

property of the estate at the relevant time in question since it had been surrendered as part of the

confirmed, amended plan.[9]

As previously noted, part of the Plan confirmed by this Court's May 12, 2005 Order

when referring to Star Lanes, provided: "Business will either be sold or the premises surrendered

within 30 days."  The Bankruptcy Code specifically allows a confirmed plan to deal with a secured

claim by including in the plan a provision that the Debtor will surrender the property securing the

claim to the claim holder.  *See 11 U.S.C. §1325(a)(5)©*.  The Bankruptcy Code does not provide an

explanation as to the meaning of the term "surrender" but case law establishes that the term refers

to the act of a debtor surrendering collateral to a lienholder who then disposes of the property

pursuant to the requirements of state law.  See *In re Losak,* 375 B.R. 162, 164 (Bankr. W.D. Pa.

2007).  Pursuant to the Bankruptcy Code, the surrender of collateral requires a mutual agreement

---

[9]        The Stranko *Motion* is somewhat confusing in that the title speaks to "abandonment" of the property, while in
the body of the *Motion* there is reference to the Debtor having "surrendered" the property.  The two concepts are distinct. See *In re
Robertson* 72 B.R. 2 (Bankr. D. CO 1985). The Bankruptcy Code requires a formal notice and hearing procedure for abandonment,
*See 11 U.S.C. §554* and *Fed.R.Bankr.P. 6007*, whereas the procedure to effect surrender is undefined.  In this case, the Court believes
that "surrender" is the applicable concept and will discuss the case using that term and context

between the parties and occurs as a result of the consent of both parties. *Id*.

The Bankruptcy Code is silent as to the procedural mechanics of a surrender but as a leading treatise on the application of Chapter 13 in such an instance explains:

> The surrender of collateral through a Chapter 13 plan would seem easily accomplished by simply stating in the plan that the collateral securing a claim is surrendered to the creditor upon confirmation (or at some identified other time). There is nothing... requiring any magic words or suggesting other conditions.

Lundin, *Chapter 13 Bankruptcy*, 3rd Ed. at *§102.1* (2006). As such, all elements to accomplish a surrender of the Star Lanes property were present in this case. The Plan Confirmation Order unambiguously provided that the property would either be sold or surrendered within 30 days, i.e. by June 12, 2005. Since the property was not sold, pursuant to the Plan Confirmation Order the Debtor came under an obligation to take the necessary steps to relinquish control of the property consistent with surrender and the evidence is clear that she did so. See, e.g., *Manion v. Providian National Bank* 269 B.R. 232 (D. Co. 2001) ( clause in debtor's confirmed Chapter 13 plan providing that she would surrender certain property to creditors whose claims it secured was binding on debtor and obligated her to take steps to relinquish control of property to creditors); *In re Gay* 375 B.R. 343, 347 (Bankr. E.D. Tx. 2007) (debtor's proposal within chapter 13 plan to treat allowed secured claim by surrendering property constituted a request for authorization to surrender property and entry of confirmation order would authorize such surrender).

The key to surrender is "mutual" consent. As is clear from the record, there can be no question there was consent by the Debtor, the Strankos, and Equity One as to this surrender. The

proposed plan confirmation order was ultimately entered by the Court based on an agreement

reached at a Conciliation Conference held that same day.   All Parties manifested their agreement

to the surrender by their  subsequent actions.  As of June 1, 2005, the Debtor ceased operations and

turned over the keys to the facility so as to allow access to the Strankos in addition to later signing

the August 1, 2005 deed to them.  Equity One filed a motion to withdraw its objection to the Plan

noting that the Debtor "is surrendering the property and said property will not be part of the Chapter

13 Plan."  *See Motion to Withdraw Objection to Claim of Equity One, Inc.*,  Document No. 28.

An argument could be raised that the July 8, 2005 joint stipulation by the Debtor and

Equity One for modification of the stay to permit foreclosure on the property (*Stipulation by and

Between Debtor Elizabeth Behanna and Equity One, Inc.*, Document No. 35) is inconsistent with

the property having been surrendered pursuant to the terms of the Plan Confirmation Order.  The

Court does not view it that way.  Seeking relief from the stay was a simple expedient that would

remove any doubt about the propriety of Equity One's pursuit of the foreclosure action – a cautious

"belt and suspenders" approach.[10]  If anything, the joinder of the Debtor in the Stipulation provides

further confirmation that she had surrendered the property and was in agreement with Equity One

taking whatever steps were necessary to acquire good legal title to it.  As to why Equity One would

wish to pursue foreclosure rather than accept a deed from the Debtor, it suffices to point out that

there are a number of reasons why a secured creditor might prefer title based on court action rather

than a deed, particularly when the foreclosure process had already been initiated and liens

---

[10]      In fact, Atty. Robert H. Slone, the Debtor's bankruptcy attorney, testified to as much.  Atty. Slone testified that
the purpose for the *Joint Stipulation* was to remove any question regarding Equity One's actions in pursuing relief from stay since
the 30 day deadline for formal surrender of the property may not have been met.

subsequent to that of the lender affected the property.

As a consequence of  Star Lanes having been effectively surrendered to the Strankos

consistent with the clear terms of the Plan Confirmation Order and the subsequent actions of the

Debtor and Equity One, the property was no longer property of the bankruptcy estate at the time the

Strankos obtained the deed from the Debtor.[11]   Therefore, the automatic stay provisions of *Section

362(a)* did not apply to prevent a transfer of the property.  See *Section 362(c)(1)* ("...the stay of an

act against property of the estate under subsection (a) of this section continues until such property

is no longer property of the estate.")  In short, the Strankos did not need to seek relief from stay in

this Court before they could accept the deed and acquire legal title to the property.[12]

---

[11]      Although the Parties have not raised it as an issue, the Court notes that pursuant to *Section 1327(b)*, except as otherwise provided in the plan or confirmation order, the confirmation of a plan vests all of the property of the estate in the Debtor. There was no such exception in the plan or confirmation order in this case.  Therefore, Star Lanes property vested in the Debtor when the Plan Confirmation Order was entered.  The Debtor was not required to obtain further approval from the Court before transferring the property to the Strankos because the plan itself contemplated the sale or surrender of the property.  See *In re Turek* 346 B.R. 350, 360 (Bankr. M.D. Pa. 2006)

[12]      Although not explicitly stated as such, the Stranko *Motion* is in effect asking for declaratory relief with respect to the issue of the surrender or abandonment of the Star Lanes property by the Debtor.  It is clear that the Court has the authority to provide such declaratory relief.  *28 U.S.C. §2201*.  Furthermore, the subject matter at issue does not fall within the scope of *Fed.R.Bankr.P. 7001* so it was permissible for the Strankos to proceed by way of motion under *Fed.R.Bankr.P. 9014* rather than by an adversary proceeding.  See *In re O'Brien Environmental Energy, Inc*. 188 F.3d 116, 123-24 (3rd Cir. 1999).  Even if the Court were to conclude that the matter should have been brought by way of an adversary proceeding under *Rule 7001*, it would treat the *Motion* as though it were a complaint because it adequately sets forth a statement of the Stranko's "claim" and the parties have had ample opportunity to submit evidence in support of and argue for their respective positions.  *In re Tomczak* 2000 WL 33728176 *2-3 (E.D. Pa. 2000). Finally, the Court notes that regarding the "surrender issue", the Strankos are in essence asking the Court to interpret the effect of the plan confirmation order in light of subsequent events, something specifically within the competence of the Court. *Local Loan Company v. Hunt* 292 U.S. 234, 239, 54 S. Ct. 695, 697 (1934); *In re Resorts International, Inc*. 372 F.3d 154, 168-169 (3rd Cir. 2004).

The above analysis renders the Strankos' request for retroactive relief from stay moot. Nevertheless, for the sake of completeness, the Court will consider that aspect of the *Motion* as well because it finds that the Strankos would be entitled to retroactive relief from the stay even if Star Lanes were found to have been property of the estate at the time in question and under the umbrella of protections provided by the automatic stay.

### *Whether the Strankos are entitled to retroactive relief from the automatic stay*

When a Debtor files for bankruptcy the Bankruptcy Code automatically stays a lengthy list of actions against the Debtor and property in which the Debtor has an interest including any act to obtain possession of property of the estate or property from the estate, or, to exercise control over property of the estate. *See 11 U.S.C. §362(a)(3)*. Assuming Star Lanes had been property of the bankruptcy estate at the time, the Strankos' acquisition of legal title by the deed from the Debtor would have been contrary to the automatic stay provisions of the Bankruptcy Code. In such an instance, *Section 362(d)* of the Code [13] permits a party in interest to obtain relief from the automatic stay by requesting the Court to terminate it, annul it, modify it, or condition its terms. A party in interest, which will usually mean a creditor, may seek relief from the automatic stay on two

---

[13]        *Section 362(d)* provides in relevant part:

(d)        On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay–

(1)        for cause, including the lack of adequate protection of an interest in property of such party in interest;

(2)        with respect to a stay of an act against property under subsection (a) of this section, if-

(A)        the debtor does not have an equity in such property; and

(B)        such property is not necessary to an effective reorganization;

alternative, but not mutually exclusive, grounds.  First, the party may seek to have the stay lifted "for

cause, including the lack of adequate protection of an interest in property of such party."  *See*

*Section 362(d)(1)*.  Second, the party may seek relief from the automatic stay because the Debtor

lacks equity in the property and the property is not necessary to an effective reorganization.  *See*

*Section 362(d)(2)*.  Of course, a motion for relief from stay is usually filed by a creditor *before* it

takes some action that would otherwise violate the stay.  However, the Court of Appeals for the

Third Circuit has made clear that bankruptcy courts have the authority to grant relief from stay on

a retroactive basis in certain circumstances. See *In re Siciliano* 13 F.3d 748 (3rd Cir. 1994); *In re*

*Myers* 491 F.3d 120 (3rd Cir. 2007).

The seminal decision on this point is *In re Siciliano, supra*.  In that case, a sheriff's

foreclosure sale was held three days after the debtor had filed his second chapter 13 bankruptcy

petition, without notifying either the sheriff or the creditor of the filing.  The creditor sought

retroactive relief from stay from the bankruptcy court to validate the sheriff's sale but was denied

relief.  The creditor appealed to the District Court, which affirmed.  The creditor then appealed to

the Third Circuit, which reversed and remanded for further proceedings.

In *Siciliano* the Third Circuit held that the bankruptcy court erred when it dismissed

the creditor's motion on the basis that the foreclosure sale was void *ab initio* and not merely

voidable.  The court of appeals found that the inclusion of the word "annulling" in *Section 362(d)*

indicated a legislative intent to apply certain types of relief retroactively to validate proceedings that

would otherwise be void *ab initio*. Thus, the bankruptcy court did have the authority to grant an

annulment of the stay and if it had done so, the post–petition sheriff sale would have been validated

16

as an exception to the void *ab initio* rule.  The Third Circuit remanded the case to the bankruptcy court to determine whether the conditions of *Section 362(d)(2)* were met such that relief from the stay should have been granted.

Recently the Third Circuit revisited this issue in *In re Myers, supra*, wherein it reaffirmed that actions in violation of the stay are void but retroactively ratifiable if the stay is annulled "as this conclusion gives courts flexibility to resolve conflicts involved in the resolution of significant claims and reflects the most logical interpretation of *Section 362(d)* of the Bankruptcy Code."  491 F.3d at 128.  The *Myers* court also stressed that the decision whether to annul the automatic stay is committed to the bankruptcy court's discretion, and that bankruptcy courts are accorded wide latitude to balance the equities when considering whether to grant relief from the automatic stay.  *Id* at 130.

After having reviewed the pleadings and considered the evidence submitted by the Parties, the Court concludes that retroactive annulment of the stay is warranted in this case under either of the prongs of *Section 362(d)* because of the strong likelihood that the Court would have granted the Strankos relief from stay to allow them to accept the deed from the Debtor on August 1, 2005, had the Strankos  requested such relief at that time and prior to accepting the deed.

First, under *Section 362(d)(1)* there was a good basis for finding "cause" to grant relief from the stay.  "Cause" as used in this provision is not defined, leaving the Court to consider what constitutes cause based on the totality of the circumstances in each particular case.  *In re Wilson* 116 F.3d 87, 90 (3rd Cir. 1997).  It is an intentionally broad and flexible concept that permits a bankruptcy court, as a court of equity, to respond to inherently fact–sensitive situations.  *In re*

17

*Texas State Optical, Inc*. 188 B.R. 552, 556 (Bankr. E.D. TX 1995).

In the present case there are multiple reasons for finding cause to grant relief from the stay. The Debtor had clearly indicated that she had no intention of operating the Star Lanes business and intended to sell or surrender the property. This was apparent from both the amended plan and the joint stipulation which the Debtor filed with Equity One that resulted in the Court's July 14, 2005 Order granting Equity One relief from stay. Once relief from stay had been granted to Equity One with respect to Star Lanes there was no reason why the same relief should not have been granted to the Strankos as well. Moreover, the Debtor had ceased business operations at Star Lanes as of June 1, 2005, thereby threatening the future viability of the business unless it was quickly reopened because of the peculiarities of the bowling industry as discussed above. The evidence also showed that the Star Lanes property had become rundown during the period of ownership by the Debtor, a process that could only have gotten worse if the property were permitted to remain vacant while Equity One pursued the foreclosure. For all these reasons, it is clear this Court would have granted a timely request for relief from stay by the Strankos for cause under *Section 362(d)(1)*.

It is even more likely that this Court would have granted the Strankos relief from stay pursuant to *Section 362(d)(2)*. Under that provision, a court is required to grant relief from stay if the debtor lacks equity in the property and the property is not necessary for effective reorganization. Both of those elements would have been met in the present case. First, with respect to the latter, there can be no dispute that the Star Lanes property was not necessary for an effective reorganization at the time the Strankos took the deed from the Debtor. The Debtor had made an effort to operate the business after her son's untimely death but found it necessary to seek bankruptcy protection

18

because the business was failing. After filing her bankruptcy petition the Debtor initially made some further efforts to operate the business but it became apparent fairly quickly that she could not successfully do so due to her lack of experience and her other time commitments associated with her full-time employment as a nurse. By May 2005 the Debtor agreed that the best course was to forgo further efforts at operating the business. Therefore, the property was not necessary for an effective reorganization as of August 1, 2005.

Turning to the "lack of equity" element under *Section 362(d)(2)*, the Court must consider the fair market value of the Star Lanes property as of the relevant time period (i.e., on or about August 1, 2005) in comparison with all of the secured claims on the property. See *In re Indian Palms Associates, Ltd.*, 61 F.3d 197, 206-208 (3rd Cir. 1995). Here, the Parties disputed the fair market value of the property and that issue took up a significant portion of the evidentiary hearing. The valuation issue was also somewhat complicated by the fact that the arson fire destroyed the Star Lanes building in November 2005, so it is no longer available to be inspected for an appraisal valuation.

The Strankos presented the testimony of a professional appraiser named Merico Lignelli who provided his opinion that the value of the Star Lanes property as of August 1, 2005 was $175,000. Mr. Lignelli testified that he was personally familiar with the Star Lanes property because he had appraised it in February 1996 and maintained his file on that appraisal when he was contacted by counsel for the Strankos in connection with the current matter. He testified that in 1996 he had appraised the property at $180,000. To arrive at his opinion of the value of that same property as of August 1, 2005, he assumed the property had experienced only normal wear and tear

and received normal upkeep since he had last seen it.

Mr. Lignelli identified several factors that he used in formulating his opinion.  He testified that the geographic area where Star Lanes was located is somewhat depressed economically and that it has lost population since his previous appraisal.  He also identified two other comparable sales of bowling alley properties that had occurred within a few years of the target date and a few miles from Star Lanes.  One of these facilities was quite similar in age, construction, and size with the Star Lanes property and it indicated a "per lane" sales price of $12,490.[14]  The other facility was larger, more modern and contained more amenities.  It indicated a per lane sales price of $27,777.  Mr. Lignelli credibly testified that he believed the Star Lanes property would have fallen somewhere between these two figures and that his opinion was of a per lane figure of $17,500, leading to a fair market value of $175,000 for the 10-lane facility.

T.H.E. Insurance, while not presenting any contrary expert opinion testimony as to the value of the Star Lanes property, in an attempt to counter the Lignelli opinion as to value, did point to evidence which it contended proved the property was actually worth substantially more than Mr. Lignelli had opined.[15]  T.H.E. Insurance noted that the Debtor listed the property as having a

---

[14]     Although this facility had been operated as a bowling facility prior to the sale, and still had the bowling equipment within, the buyer intended to turn the building into an indoor archery range.

[15]     At the final argument, Counsel for T.H.E. Insurance questioned the credibility of Mr. Lignelli's opinion because he failed to consider testimony given by Mr. Stranko at the evidentiary hearing that he had put "over $400,000" into the Star Lanes property during the time he had owned it.  The import of Counsel's argument in this regard seems to have been that Mr. Lignelli's valuation was too low in view of the amount put into the property by the Strankos.  The statement at issue was made by Mr. Stranko near the end of his testimony, in response to a question by the Court.  The Court's basic question to Mr. Stranko was whether the $300,000 sales figure to the Behannas included more than just the building itself.  In the course of answering in the affirmative, Mr. Stranko stated that "during the 23 years" he had owned the business he had put more than $400,000 into it.  He named several items that were included in the amount, including a new roof, new lanes, and automatic scoring equipment.  (*See Audio Transcript of Proceedings* dated Nov. 15, 2007, 1:45:50 - 1:47:00).  However, Mr. Stranko did not purport to give a detailed itemization of all that was included in the $400,000 figure, nor did he say when during the long course of his ownership any of the expenditures were made,

value of $250,000 in Schedule A of her bankruptcy petition, filed on December 27, 2004. It also

pointed to the Stranko–Behanna sale in 2001 which had a sales price of $300,000 and the Stranko-

Weightman contract from July 2005 which referenced a sales price of $275,000. Finally, T.H.E.

Insurance relied upon a letter sent from the Strankos to the Westmoreland County District

Attorney's Office after the arson fire which stated that the fire caused a "loss" in the amount of

$300,000.

After careful consideration of the evidence, and in full recognition that in its role of

fact-finder it is not required to accept the uncontradicted testimony of an expert witness, the Court

concludes that Mr. Lignelli was a credible witness and his opinion that the Star Lanes property

possessed a value of $175,000 as of August 1, 2005 is accepted by the Court. Mr. Lignelli is a

certified general appraiser by the Commonwealth of Pennsylvania and has been so since 1991. He

used a standard methodology in arriving at his opinion as to value. The Court is impressed by the

fact that he had personal knowledge of the property in connection with the 1996 appraisal he

performed. Mr. Lignelli testified that he had not previously done work for the Strankos or their

attorneys. Finally, the fee he received for his testimony in this case was reasonable. Therefore,

there is no basis for questioning his objectivity. In contrast, there are problems with each of the

---

nor did he provide any testimony as to what sort of effect the expenditures may have had on the long-term value of the property.
Counsel was given an opportunity to further question Mr. Stranko on these matters after he made his statement, but did not pursue
this line of inquiry.

In the absence of any further evidence as to the nature and timing of the expenditures by the Strankos and if they
affected the value of the property, the Court concludes that Mr. Stranko's statement has little, if any, relevance on the question of
what the property was worth in the summer of 2005. Moreover, Mr. Lignelli was never cross-examined about this point at the hearing
and the Court is not willing to diminish its estimation of the credibility of his opinion based on something to which he never had an
opportunity to respond. The Court would further note that Mr. Lignelli testified that his opinion was based on its assumption that
the property had received normal repairs and maintenance since he viewed it in connection with his prior appraisal, when in fact, the
undisputed testimony established that maintenance and repairs during the Behanna ownership were substandard such that the property
was in poor condition when the Strankos got it back. Any weak inference that the Lignelli valuation should have been higher based
on Mr. Stranko's statement about how much he put into the business while he owned it is more than offset by the opposite inference
that the valuation should have been lower because of the poor condition of the property.

items of evidence relied upon by T.H.E. Insurance in its attempt to demonstrate a higher value for the property at the relevant time.

The Debtor testified that she listed the value of Star Lanes at $250,000 in her bankruptcy petition and she arrived at the number simply because that is what the couple who were managing the business for her at the time told her they believed the value to be. This figure is not based on the Debtor's personal knowledge and consequently carries little weight with the Court. Nor is the $300,000 gross figure from the Stranko–Behanna 2001 sale an accurate indicator of the property value because that sale included far more than just the real property. The Behannas were also buying a successful ongoing business including the personal property, goodwill and the income stream that went along with it. [16] Although there was no testimony as to the value placed on each of these separate assets for purposes of the sale, the deed from the Strankos to the Behannas recited a consideration of $180,000, as did the HUD–1 created as part of the transaction. Under the circumstances, the only reasonable conclusion to draw is that this $180,000 figure represented the value the Parties placed on the real estate, only, with the balance representing the value of the

---

[16] At the evidentiary hearing there was some testimony related to the personal property the Strankos acquired along with the Star Lanes real estate. Counsel for T.H.E. Insurance pointed out that, in addition to the $250,000 valuation for Star Lanes on the Debtor's Schedule A, she also listed a valuation of $14,365 on Schedule B for "Equipment Inventory for Bubby's Star Lanes". A list attached to Schedule B itemized this equipment. The suggestion from Counsel seemed to be that by acquiring this property the Strankos had received substantial unencumbered property that had value to the bankruptcy estate. The Court does not agree with that suggestion. Both the Equity One and Stranko mortgages cover not only the real property but also "fixtures now or hereafter a part of the property." *See* the Equity One mortgage filed at Claim No. 3 and the Stranko mortgage at Exhibit 4. The Court has reviewed the list attached to Schedule B and it appears that the large majority by value of the items shown on the list (for example automatic pinsetters, bowling lanes, and scoring machines) would be considered fixtures subject to the mortgages. *See, e.g.*, 35A Am. Jur. 2d, Fixtures §95 (as between mortgagor and mortgagee, bowling alleys are usually fixtures, especially if the building housing them was specially built for that purpose). Simply because the Debtor identified and valued these items as personal property in her petition cannot change the fact that they are covered by the mortgages. The testimony established that the value of the remaining items on the list is small (and that many of these remaining items were in such poor condition that they were not usable), such that any unencumbered personal property that the Strankos received along with Star Lanes will be treated as *de minimis* and not worth pursuing for the benefit of the estate. The Court notes that Atty. Slone, an experienced Chapter 7 trustee with extensive experience in the liquidation of business assets testified to the same effect. See n. 17, *infra*.

personalty and intangibles.

The $275,000 figure from the Stranko-Weightman contract from the summer of 2005 is a flawed indicator of the real property value for similar reasons. Again, Mr. Weightman was not simply purchasing the real property but rather the "prospect" of a functioning business that would be operating on that property. Mr. Stranko testified that part of the agreement included that he would work with Mr. Weightman to repair and rehabilitate the facility. Mr. Stranko also agreed to attempt getting the bowling alley back in operation by making the necessary contacts to arrange for bowling leagues scheduled to be in place as of August 1, 2005. Moreover, Mr. Weightman never made the $30,000 down payment called for by the contract. Only two or three of the monthly installments under the contract had been made at the time of the arson fire. Furthermore, the Strankos had committed to pay out of their own pocket an additional $1,000 per month toward the debt service on the Tan-O-Bell Lanes loan presumably because the anticipated revenue from Star Lanes was not sufficient to pay the full amount of the loan payment. There is, therefore, considerable room for doubt as to whether the contract would ever have been completed if the fire had not occurred. Based on these considerations, the purchase price contained in the agreement carries little weight, if any, in countering the value opinion of Mr. Lignelli.

Finally and for similar reasons, the letter from the Strankos to the District Attorney provides little or no support for T.H.E. Insurance's position. The first paragraph of that letter states:

> The loss of Star Lanes bowling center at 134 Donner Ave, Monessen, Pa is in the amount of $300,000. This is the amount the business was sold in the year 2001. This includes the building.

23

(Ex. F).  This statement clearly indicates that the $300,000 "loss" figure was derived from the 2001

sale price and included more than just the building.  Even though the letter is under Mr. Stranko's

name, it was actually prepared by Mrs. Stranko who credibly testified that the "$300,000" figure was

simply intended to reflect the 2001 valuation for sale of the "business."  Once again, the Court can

only conclude the letter intended to include not just the real estate value but also the value of the

personalty and intangible assets in determining the overall value of the loss.  As such, the only

reasonable conclusion to be drawn is that the $300,000 value included the "business", i.e., land,

personalty, intangibles, not just the real estate.

For all of the above reasons, the Court concludes that the Star Lanes property had a

fair market value of $175,000 as of August 1, 2005.  From that conclusion it inexorably follows that

the Debtor lacked equity in the property on that date.  The admitted secured claims of Equity One

and the Strankos as of that time totaled at least $198,000, well in excess of the property value.[17]

Thus, it is clear that the Strankos would have had an entitlement to relief from stay

under either of the two alternative tests set forth in *Section 362(d)* had they timely sought relief.

Furthermore, although T.H.E. Insurance has advanced the argument that the Strankos were engaged

---

[17]      T.H.E. Insurance stipulated at the evidentiary hearing that the Equity One claim totaled $162,000 at the relevant
time and the Stranko secured claim was at least $36,000.  Furthermore, the Strankos also called the debtor's attorney, Robert Slone,
as a witness.  Atty. Slone testified that he thought the transfer of the property to the Strankos was an appropriate step because he did
not believe the fair market value of the property was greater than the Equity One and Stranko secured claims.  In the context of this
relief from stay issue he was not asked about and did not offer an opinion as to the exact fair market value of the property.  Rather,
his testimony related to the thought processes he engaged in for determining whether any equity existed in the property for purposes
of challenging Equity One's attempt to obtain relief from stay when according to T.H.E. Insurance its debt was significantly lower
than the value of Star Lanes.  Atty. Slone's overall conclusion in this regard, i.e., that the "value" was less than the cumulative amount
of the secured claims, carried additional weight for this purpose because of Atty. Slone's background.  He has been a Chapter 7
trustee for almost 30 years with considerable experience with the sale of business assets in a bankruptcy setting.  Furthermore, Atty.
Slone recited personal knowledge of the Monessen area, having lived their himself while growing up, and agreed with Mr. Lignelli's
characterization of the area as "depressed."

in an underhanded or deceptive scheme to "pocket" equity from the Star Lanes property that rightfully belonged to the bankruptcy estate (see, e.g., *Respondent T.H.E. Insurance Company's Brief in Opposition to Movants' Motion for Relief from Automatic Stay and to Abandon Property Nunc Pro Tunc,* Document No 61), the Court finds no evidence to support that contention.

Both Mr. And Mrs. Stranko testified at the hearing and the Court found them to be straightforward and generally credible witnesses.  They built Star Lanes as a family business over many years of hard work and sold it to the Behannas in 2001 as a step toward their eventual retirement.  With the filing of the Behanna bankruptcy and the subsequent events in mid-2005, they faced the prospect of the property being sold by Equity One at a foreclosure sale which, if they did not act quickly and definitively, would cause them to lose their security in the property along with any realistic prospect of making a recovery on the debt owed to them by the Debtor.  In these circumstances, it was only natural that the Strankos would make efforts to try to salvage something out of the situation.  The gravity of the circumstances they faced is further demonstrated by the mortgage loan they took out on the Tan-O-Bell Lanes property in order to obtain the needed funds to pay Equity One; at a time when only a few payments were left on its existing mortgage.

Any shortcomings in the manner in which the Strankos went about reacquiring Star Lanes from the Debtor were the result of ignorance of the bankruptcy process coupled with the exigency of getting the business reopened in time for the upcoming bowling season and not part of any improper design.  There is no evidence that the Strankos used coercion or deception to convince the Debtor to sign the deed for Star Lanes.  She was being represented by experienced bankruptcy counsel and he was fully-informed about what was going on and, in fact, reviewed the deed before

25

she signed it. Each of the specific details concerning the transaction that T.H.E. Insurance points to

as evidence of bad faith are susceptible to a more benign explanation.[18]

In sum, the Court finds no evidence that the Strankos acted in bad faith.  To be sure,

mistakes may have been made, but they were caused by excusable neglect rather than deliberate

wrongdoing.  To the extent these mistakes are even relevant, under the circumstances, they do not

warrant denial of retroactive relief from the stay.

## *CONCLUSION*

For all the foregoing reasons, the Court finds that the Strankos are entitled to the

relief they seek in the *Motion*.[19]  The Court finds that the Star Lanes property had been effectively

surrendered by the Debtor at the time she deeded it to the Strankos, hence there was no violation of

the automatic stay by the Strankos.  In the alternative, even if the property were still subject to the

automatic stay at the time in question, the Strankos have met their burden to obtain relief from the

---

[18]     For instance, regarding the points not previously discussed, T.H.E. Insurance made much of the fact that the Strankos did not inform the Debtor about their contract with Weightman.  However, there was no legal obligation for the Strankos to do so, and the Court will not ascribe deception to the Strankos with respect to something they were not required to disclose.  T.H.E. Insurance also highlights that the Strankos contracted with Weightman even before they had acquired the property from the Debtor. While true, this is irrelevant to the Court's consideration.  The Strankos' alleged overzealousness to enter into an agreement with Weightman does not equate to bad faith.  Under the circumstances they were forced to take quick, decisive action.  T.H.E. Insurance also argues that the deed from the Debtor to the Strankos falsely states that Joseph Stranko "is succeeding to [Equity One's] interest", whereas in fact there had been no assignment by Equity One as of that time.  Although there had been no formal assignment at that point, discussions had occurred with Equity One coming from the Strankos or their representatives.  It is clear from the cumulative effect of their actions that an agreement was struck and the Strankos would pay off the Equity One obligation.  The language in the deed can be viewed either as a loose use of language to the effect that a verbal agreement had been reached with Equity One or as a representation that the transfer of Equity One's interest to Mr. Stranko was in progress.  At the end of the day, Equity One's position was transferred to the Strankos despite the lack of formal paperwork.  Again, as with the Stranko to Behanna sale from 2001, the legal services that were provided in connection with the events in 2005 left something to be desired but the failure to formally document the assignment under the facts of this case does not redound to the detriment of the Strankos.

[19]     This Memorandum Opinion constitutes the Court's findings of fact and conclusions of law.

26

stay on a *nunc pro tunc* basis.

If the Star Lanes property had been property of the estate during the summer of 2005 when the Strankos began undertaking actions designed to transfer ownership of that property from the Debtor to them, culminating in the August 1, 2005 deed, the Court would have been amenable to a motion for relief from stay to authorize those actions. Such a motion would have been well-founded under both the "for cause" test of *Section 362(d)(1)* and the "lack of equity" test of *Section 362(d)(2)*. The Court concludes that, if it were necessary, this same relief would be granted now, retroactively, on a *nunc pro tunc* basis, since there is no credible evidence to suggest that the Strankos have acted in bad faith. The relief that the Court would be prepared to grant would include not only relief from the stay with respect to actions already completed, but also with respect to any actions related to the property that the Strankos may need to take in the future to establish or protect their interest in it.

As it is, however, the Court concludes that stay relief is not necessary here because the Star Lanes property had already been surrendered by the actions of the Debtor, starting with her turnover of the building keys to the Strankos on or about June 1, 2005, so that they could prepare it for the upcoming bowling season. Moreover, this surrender was accomplished with the permission of the Court, as set forth in the Plan Confirmation Order. Once the property had been surrendered, it was no longer property of the estate or subject to the automatic stay and the Strankos are not now required to seek stay relief from this Court.

27

An appropriate Order will issue.


Dated: April 4, 2008

_____
Thomas P. Agresti
United States Bankruptcy Judge


Case Administrator to serve:
        Ronda Winnecour, Chapter 13 Trustee
        Debtor
        Mary Bower Sheats, Esq.
        Gary Davis, Esq.
        Donald G. Lucidi, Esq.
        Gary Bax, Esq.

CM:    Mary Bower Sheats, Esq.
        Gary Davis, Esq.
        Gary Bax, Esq.
        Donald G. Lucidi, Esq

IN THE UNITED STATES BANKRUPTCY COURT FOR THE
WESTERN DISTRICT OF PENNSYLVANIA

IN RE:

ELIZABETH R. BEHANNA                    :       Case No. 04-36839 TPA
dba Bubby's Star Lanes,                 :
            Debtor                      :       Chapter 13

        JOSEPH J. STRANKO AND NELLIE :
        DARLENE STRANKO,                :
                 Movants                :
                                        :       Related to Document No. 51
            vs.                         :
                                        :
        ELIZABETH R. BEHANNA, T.H.E.  :
        INSURANCE COMPANY and         :
        RONDA J. WINNECOUR, ESQUIRE,:
        Chapter 13 Trustee,             :
                     Respondents        :

## **ORDER**

AND NOW, this *4th* day of *February, 2008*, consistent with the findings of fact and conclusions of law set forth in the foregoing *Memorandum Opinion*, upon consideration of the *Motion to Abandon Property and for Relief from the Automatic Stay Nunc Pro Tunc* filed by Joseph J. Stranko and Nellie Darlene Stranko ("the Strankos") and the *Response* thereto filed by T.H.E. Insurance Company, it  is hereby  *ORDERED, ADJUDGED and DECREED*  that the subject *Motion* is *GRANTED* in that:

(1)   The Court's Order Confirming Plan as Modified ("Plan Confirmation Order") signed and filed on May 12, 2005 at Document No. 26 provided that the real property located at 134 Donner Ave., Monessen, Pennsylvania, more particularly described in the deed dated February 23, 2001 and recorded in the Recorder's Office of Westmoreland County on April 9, 2001 at Instrument

1

No. 200104090015565 ("the Property") would either be sold or surrendered within 30 days;

(2)    Pursuant to the Plan Confirmation Order and the actions of the Debtor, the Debtor's interest in the Property was surrendered from the bankruptcy estate on or about June 1, 2005 when she turned the keys over to the Strankos;

(3)    Upon the surrender of the Property by the Debtor, it was no longer property of the estate and therefore no longer subject to the automatic stay provisions of *11 U.S.C. §362*;

(4)    Upon surrender of the Property the Strankos were not required to seek relief from stay from this Court before undertaking further activities related to the Property including acceptance of the deed from the Debtor on or about August 1, 2005 and negotiating with and paying off the Equity One obligation; and,

(5)    Since the surrender of the Property, no events have occurred which would return it to the bankruptcy estate rendering it property of the estate.

_____
Thomas P. Agresti
United States Bankruptcy Judge

Case Administrator to serve:
     Ronda Winnecour, Chapter 13 Trustee
     Debtor
     Mary Bower Sheats, Esq.
     Gary Davis, Esq.
     Donald G. Lucidi, Esq.
     Gary Bax, Esq.

CM:    Mary Bower Sheats, Esq.
     Gary Davis, Esq.
     Gary Bax, Esq.
     Donald G. Lucidi, Esq.

2